IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Dana Dukes Tyler,<br><br>                Plaintiff,<br><br>   vs.<br><br>Carolyn W. Colvin, Acting<br>Commissioner of Social Security,<br><br>                Defendant. | Civil Action No. 6:15-770-MBS-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

       This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

       The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

       The plaintiff filed an application for disability insurance benefits on September 2, 2011. On the same date, he also protectively filed a Title XVI application for supplemental security income. In both applications, he alleged disability beginning August 1, 2011. The applications were denied initially and on reconsideration by the Social Security Administration. The plaintiff requested a hearing. An initial hearing was held on March 20, 2013, at which the plaintiff, his attorney, and an impartial vocational expert, Jacqueline Merritt, appeared. A supplemental hearing was held on October 16, 2013, at which the plaintiff, his attorney, and an impartial vocational expert, Carey A. Washington, also

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

appeared. The administrative law judge ("ALJ") considered the case *de novo* and on November 8, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied review on December 24, 2014.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of

establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was born on January 13, 1971 (Tr. 98). He has a GED and past work history as an assembler, a line truck operator, and a tractor operator on a farm (Tr. 257). He alleges that he became disabled to work on August 1, 2011, due to depression, temper disorder, mood swings, audio hallucinations, carpal tunnel, body shakes, and poor eyesight (Tr. 256).

### *Aiken Barnwell Mental Health*

On March 17, 2009, the plaintiff requested help with his mood and anger symptoms. His history included two admissions to Aurora Pavilion Behavioral Health Services ("Aurora") (December 2006 and January 2007) (Tr. 369-70). After an admission to Aurora, the plaintiff was seen on September 7, 2011. He was easily distracted, exhibited psychomotor agitation, and reported severe mood swings. The plaintiff experienced audio and visual hallucinations. He was extremely agitated and reported that he was unable to be around others (Tr. 371-75).

On October 4, 2011, the plaintiff's counselor, Harry T. Douglas, reported that the plaintiff was agitated and menacing to another counselor, who was afraid that he might attack her based on his presentation. The plaintiff admitted to hearing voices. Mr. Douglas felt the plaintiff was clearly psychotic and referred him to John A. Pybass, M.D. (Tr. 381). On December 7, 2011, the plaintiff was still symptomatic and had a good deal of psychomotor agitation. Risperdal was prescribed (Tr. 414). On January 31, 2012, the plaintiff was seen after a recent admission to Aurora. The plaintiff reported feeling severely depressed, and he related his temper problems and irritability to his depression. Patricia N. Watkins, M.D., diagnosed the plaintiff with major depressive disorder, recurrent, severe

with psychotic features, borderline personality disorder, obesity, likely obstructive sleep apnea, bilateral carpal tunnel syndrome and osteoarthritis (Tr. 484-86).

On June 7, 2012, Mr. Douglas wrote that he regularly treated the plaintiff for depression. The plaintiff's progress had been uneven. At times he was highly agitated and emotionally labile. The plaintiff was not able to work productively (Tr. 512). On June 10, 2012, Mr. Douglas wrote that the plaintiff was not capable of working. He was no longer drinking, but he was still agitated (Tr. 553). On August 27, 2012, Mr. Douglas reported that the plaintiff had not been drinking, and he was compliant with medications. His agitation level and temper were improved, but he was socially isolated and paranoid (Tr. 555). After a September 2012 admission to Aurora, Mr. Douglas wrote that the plaintiff was still quite fragile and irritable. Mr. Douglas indicated that he would convey to the new therapist that the plaintiff could destroy himself. Mr. Douglas was not optimistic of a positive outcome for the plaintiff (Tr. 559). On November 9, 2012, Mr. Douglas wrote that the plaintiff's progress had been limited and marked by uneven responses. It was his opinion that the plaintiff was not capable of gainful employment until he was stable and not agitated and depressed to the point of being at risk for self-destruction (Tr. 563).

On November 29, 2012, the plaintiff met with Dr. Watkins. He reported adherence with medications, but he sometimes heard his mother call his name and saw shadow people near the woods around his home. He was depressed and irritable, but improved (Tr. 575-77). On December 3, 2012, the plaintiff started meeting with William R. Taylor. On that date, the plaintiff yelled at the mental health center's staff. He reported that he had trouble controlling his anger (Tr. 583). On February 15, 2013, the plaintiff called in distress and reported that he was having a rough day with audio and visual hallucinations (Tr. 584).

On February 21, 2013, the plaintiff met with Dr. Watkins and reported adherence to medications, but it did not seem like they were doing anything. He still woke

up every day and wanted to die. The plaintiff reported being paranoid. He spent most of day and night on the couch and isolated himself to control the images of violence in his head (Tr. 578-79). On the same date, Mr. Taylor reported that the plaintiff was experiencing an increase in symptoms. He could not go outside because he saw and heard people even though they were not there (Tr. 585).

On May 13, 2013, the plaintiff reported that he had missed counseling sessions because he did not have gas money (Tr. 596). On August 23, 2013, the plaintiff had feelings of worthlessness, paranoia, and suicide. He heard voices in his head that told him to do things despite compliance with medication. He tried to drown out the sound of the voices with TV or headphones. He had suicidal thoughts about once a day (Tr. 598). On September 23, 2013, the plaintiff was still seeing things and hearing voices. He was afraid of what he might do if he was angry around people. He became angry and screamed at the therapist when presented with alternative coping skills (Tr. 602). On September 24, 2013, the plaintiff had a lot of anxiety and was still seeing things and hearing voices. His Depakote prescription had been increased from 500 to 1500 mg to address continuing irritability. Inversa was added to address paranoid thinking. The plaintiff reported severe nightmares about childhood abuse and was diagnosed with post- traumatic stress disorder ("PTSD") (Tr. 604-05).

### *Aiken Regional Medical Center/Aurora Pavilion*

The plaintiff was treated at Aurora from August 25 to August 30, 2011. He had a history of depression and adjustment disorder. The plaintiff had increased thoughts of hurting himself and others. He also exhibited increased mood swings and concentration. The plaintiff was diagnosed with major depressive disorder, carpal tunnel syndrome, and poor coping skills. He was prescribed Celexa and Xanax (Tr. 344- 62).

On January 8, 2012, the plaintiff was treated for panic attacks, anxiety, hallucinations and agitation. He was at moderate risk for suicide. The plaintiff was

diagnosed with bipolar affective disorder, manic, with psychosis. His GAF score was 30. He was discharged with a recommendation of outpatient treatment (Tr. 443-51). On February 2, 2012, the plaintiff was seen for "mood swings." His insight and judgment were poor, and he was poorly rested. The plaintiff was diagnosed with probable substance abuse, substance-induced mood disorder, bipolar disorder, personality disorder, and obesity. Alexander Kechriotis, M.D., indicated that the plaintiff's mood lability might be due to personality coping skills, substance use, or bipolar disorder, but based on his history and old records, it appeared as if the plaintiff had a combination of the three. Depakote was prescribed (Tr. 464-73).

On September 15, 2012, the plaintiff was admitted to Aiken Regional Medical Center for uncontrolled diabetes and suicidal ideations. He endorsed auditory and visual hallucinations. He felt paranoid and his insight and judgment were poor. The plaintiff's girlfriend called EMS when the plaintiff held a gun to his head. The plaintiff stated he was compliant with medications, but they were not helping (Tr. 515-65). The plaintiff returned in November for an 8-day admission to Aurora. The plaintiff experienced depression, increasing auditory hallucinations, and anger outbursts. He had been told by the pharmacist to quit taking Risperdal. The plaintiff was diagnosed with bipolar disorder, depression, and antisocial traits. Seroquel was prescribed in place of Risperdal (Tr. 566-67).

On November 9, 2011, A. Nicholas DePace, Ph.D., found the plaintiff's symptoms were consistent with a psychotic disorder because he was hearing voices. The plaintiff had significant difficulties in managing his temper, and he was aggressive toward others. The plaintiff's tolerance for frustration was likely somewhat compromised. It was quite possible that the plaintiff met the criteria for diagnosis of a bipolar disorder. Dr. DePace found that the plaintiff could perform three-step commands, particularly if he was in a structured setting (Tr. 387-89).

***Psychiatric Review Techniques***

On November 16, 2011, Timothy Laskis, Ph.D., found the plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. The plaintiff had one or two repeated episodes of decompensation due to severe impairments of affective disorder, personality disorder, and substance addiction disorder (Tr. 106). On February 27, 2012, Samuel Goots, Ph.D., opined the same (Tr. 139-40).

***Margaret J. Weston Medical Center - Dr. John A. Pybass, M.D.***

On March 7, 2012, Dr. Pybass treated the plaintiff after he was discharged from Aurora on February 7, 2012. Dr. Pybass documented the plaintiff's psychomotor agitation, grossly impaired concentration, and distractible thought process. He diagnosed the plaintiff with major depressive disorder, recurrent, severe, with psychotic features, alcohol dependence, rule out PTSD, and borderline personality disorder (Tr. 492).

On April 5, 2012, Dr. Pybass opined, given the plaintiff's personality issues and substance dependence, that it was unlikely he could conform to work expectations at that time. The plaintiff had poor ability to remember work-like procedures, maintain attention for two-hour segments. He also had poor ability to maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically-based symptoms, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers, and be aware of normal hazards. The plaintiff had a poor ability to interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and travel in unfamiliar places. The plaintiff should not work with dangerous machinery, and he would miss more than four days of work per month at his current state of functioning (Tr. 501-04).

8

On May 8, 2012, the plaintiff reported two months of sobriety to Dr. Pybass. The plaintiff experienced extreme discomfort with being around people. He had a faint audio hallucination and paranoid ideation; and he met some criterion for PTSD. He exhibited moderate psychomotor agitation (Tr. 508-509).

**Kimberly K. Kruse, Psy.D.**

On April 10, 2013, Dr. Kruse performed a consultative mental examination of the plaintiff. The plaintiff reported auditory and visual hallucinations. He also reported problems concentrating and getting along with co-workers. The plaintiff stated that every morning when he woke up he wanted to die. He had limited energy and limited ability to focus. He stayed inside because he was easily angered. Dr. Kruse wrote that the plaintiff presented with anxious mood, but he had no evidence of overt psychosis or delusional process. She diagnosed the plaintiff with nicotine dependence, mood disorder, not otherwise specified, and rule out cluster B personality traits. Dr. Kruse believed that a significant part of the plaintiff's presentation was related to Axis II personality factors related to cluster B category. Dr. Kruse was unable to differentiate the patient's report of symptoms from previous illicit substance abuse. She determined that the plaintiff was reporting typical symptoms of psychosis, and these experiences might better relate to cluster B personality functioning. Dr. Kruse felt that a formal psychological assessment would better assist in understanding differential diagnosis. She recommended anger management treatment as well as cognitive behavioral therapy and/or dialectical behavior therapy. She noted that the plaintiff might be most successful in working in an environment with limited social interaction due to an inclination for interpersonal discord, and he had a limited capacity for stress tolerance. She opined that the plaintiff had moderate impairment in his ability to understand, remember, and carry out complex instructions and in his ability to make judgments on complex work-related decisions, but no impairment in his ability to understand, remember, and carry out simple instructions. Dr. Kruse opined that the plaintiff

had mild impairment in his ability to interact appropriately with the public, supervisors, and co-workers. She believed that the plaintiff was capable of using appropriate judgment if he chose to do so (Tr. 586-93).

*Hearing Testimony*

The plaintiff testified at the first hearing in March 2013 that he was 42 years old. He lived in a mobile home with a friend and her two children, ages 10 and 8. He was 5'6" and weighed 226 pounds. He did not have a source of income, but his girlfriend did. He had a driver's license, but he did not drive. His girlfriend drove him to the hearing. He was in the Army National Guard for eight years and in the Navy for two years and was honorably discharged. He smoked a pack of cigarettes a day. He used to drink alcohol, but he had not had a drink since January 2012. The plaintiff quit doing drugs after he was a patient at Aurora (Tr. 36-40).

The plaintiff testified that his past work included that of an assembler, manual labor, and driving a tractor. He had been laid off and fired from jobs. He could not get along with his co-workers. He had not worked since August 1, 2011, and he had not collected unemployment. He was taking the medications that were on his medication list, as well as Invetra. He had been taken off of Risperdol (Tr. 41-43).

The plaintiff testified that woke up around 4:00 or 4:30 a.m. He had a cup of coffee and he tried to shut out the thoughts in his mind. The mornings and the afternoons were difficult times because he started thinking about all of the things that happened to him in the past. His girlfriend and her children woke up around 6:00 and they went to school and work. He stayed home by himself. The children's aunt picked them up from school, brought them home, and stayed with them until 9:00 p.m., when the plaintiff's girlfriend returned home from work. The children's aunt brought them home around 5:00 or 6:00 and fixed dinner for them so that the plaintiff did not have to cook. He did not do any housework or any shopping. He did not go to church. He went outside to see the chickens and the

rabbits. If he could get a ride into town he might go through the drive-thru for a hamburger, but other than that he could not be let out. He slept on the couch, and slept about four hours per night. He drifted in and out of sleep, but he did not wake up fully until 4:00 or 4:30 a.m. (Tr. 43-46).

The plaintiff stated that he had not used drugs since his November admission to Aurora when his drug screen was negative. The medications that his doctor prescribed did not get rid of his anxiety, but they helped keep him from losing his temper and from hurting other people. He did not get violent enough to hit someone, but he would get violent enough to lose his temper, get loud, and cuss, and be rotten. When the plaintiff was first admitted to Aurora in March 2012 he told them that his drug use was an attempt to relieve his symptoms. The plaintiff stated that he thought the drugs were helping him, but they were not (Tr. 47).

The plaintiff testified that he heard voices. He used to hear voices on the back porch and he called the voices his friends, Homer D and Fred. He talked to them at night and they would tell him to kill his parents, so he had to stop listening to them. The plaintiff said the people were alive, but they were not real people. They told him what food to eat, where he should go and who he should talk to. They were ruling his life, so he quit going outside at night and only stayed inside. He pretty much stayed inside all of the time and had no friends. He did not watch much TV because it reminded him of things and it stirred up anger inside of him and he wanted to kill his parents. The plaintiff isolated himself from his parents so that he would not hurt them. The plaintiff also testified that he had been abused as a child (Tr. 47-49).

The plaintiff testified that he had carpal tunnel syndrome, and his hands and fingers went numb. He had arthritis in his back. Due to back pain, he could not sleep in one place and he had to sit up. He could sit for ten minutes in a regular chair and for an hour on the sofa. He could not stand or walk very far because his back would give out. He

was limited in what he could do with his hands. His fingers were numb and he could not write very well. The plaintiff did not think he could perform a job that would involve dealing with other people on a regular basis. The plaintiff stated that his condition made it impossible for him to work, and his condition had worsened since he lost his last job due to a conflict with his boss. He had more anxiety attacks since his last job (Tr. 52-56).

After the ALJ questioned the vocational expert, the plaintiff's attorney questioned the vocational expert regarding the plaintiff's limitations as set out by Dr. Pybass in his April 2012 opinion (Tr. 62-63; *see* Tr. 499-504). The ALJ then stated:

> [L]et me save you some time here, okay. Now, because I mean, let me show you where I am on this record because at the February 2012 admission there was still active drug use. There has been no indication of active drug use after that. This medical source statement is April 2012. I am prepared to grant a favorable as of that date but not prior to it.

(Tr. 63).

A supplemental hearing was convened in October 2013, at which time the ALJ explained that she previously determined that Dr. Pybass's opinion was reasonable, but Dr. Pybass indicated that the opinion was an indication of the plaintiff's status at the time of the evaluation. As a result, the ALJ had determined a mental consultative exam was appropriate, which Dr. Kruse performed on April 10, 2013 (Tr. 68).

The ALJ stated that she was no longer prepared to award benefits from the date of Dr. Pybass' evaluation because Dr. Pybass mentioned personality issues and substance abuse, and the ALJ wanted to develop the issue of substance abuse more thoroughly. The plaintiff's attorney noted the plaintiff had a consistent work history and that there was a past issue with drug or alcohol abuse, but there was no evidence that it had been an ongoing problem since Dr. Pybass provided his assessment and opinion (Tr. 70-74).

The plaintiff testified at the supplemental hearing that he was given an honorable discharge from the Navy because he was supposed to go to AA meetings and he did not show up for them. He was put on restriction and was then laid off from the military. He smoked one pack of cigarettes a day. He did not drink. The plaintiff could not remember when he stopped drinking. He had not used any other illegal drugs since before he went to Aurora (Tr. 74-78).

The ALJ asked the plaintiff about Dr. Kruse's comment that the plaintiff denied any history of addiction outside of nicotine. The plaintiff stated that he did not have any addictions currently. He told the ALJ that the examiner did not ask him about his history of abuse. He assumed that she had all of his medical records and that he did not mean to do anything wrong (Tr. 80-81; *see* Tr. 587).

The ALJ issued an unfavorable decision on November 8, 2013, in which the ALJ stated that treatment records supported some of Dr. Pybass' findings and accorded the opinion some weight.   The ALJ accorded little weight to Dr. Pybass' opinion that the plaintiff would miss four days of work per month and gave great weight to the opinion of Dr. Kruse (Tr. 24-26).

## **ANALYSIS**

The plaintiff filed this action for judicial review on February 23, 2015.  On September 1, 2015, the plaintiff filed a brief in support of his case (doc. 14).  In his brief, the plaintiff argues that the ALJ erred by (1) failing to issue a partially favorable decision finding the plaintiff disabled as of the date of Dr. Pybass' opinion on April 5, 2012, as the ALJ indicated she would do in the initial hearing (doc. 14 at 26-30); (2) improperly considering the consultative exam by Dr. Kruse as the exclusive evidence of the plaintiff's condition following Dr. Pybass' opinion (*id.* 27-28); (3) failing to consider evidence from Dr. Pybass, Mr. Douglas, Dr. Watkins, and Mr. Taylor as to the plaintiff's condition after April 2012, which showed the plaintiff was compliant and sober (*id.* 28-30); (4) improperly giving great

weight to the opinion of Dr. Kruse when she did not have the records from the plaintiff's hospitalizations nor ongoing treatment records from his mental health provider[2], performed no formalized testing of the plaintiff, and the same reasons the ALJ used for discounting the opinion of Dr. Pybass also existed for Dr. Kruse's opinion (*id.* 31-34); (5) failing to properly consider the opinion of Mr. Douglas (*id.* 34-36); and (6) failing to properly assess the plaintiff's mental impairments as to his activities of daily living, social functioning, and difficulties in concentration, persistence, and pace (*id.* 37-42).

On November 16, 2015, the Commissioner filed a motion to remand (doc. 17) pursuant to sentence four of 42 U.S.C. § 405(g), which provides that the court has power to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Commissioner states in the motion for remand that further administrative action is warranted in this case to allow the ALJ to evaluate the plaintiff's residual functional capacity and specifically account for his moderate difficulties in maintaining concentration, persistence, or pace (doc. 17 at 1).

The plaintiff filed a response in opposition (doc. 18) to the Commissioner's motion for remand on December 2, 2015.  The plaintiff argues that the evidence submitted demonstrates that he is unable to work at the present time and that he may be a risk to himself and others due to his condition.  The plaintiff argues that the evidence supports a finding that he has been disabled since April 5, 2012, the date the ALJ originally proposed to find him disabled (*see* Tr. 63) and the date of the opinion of treating physician Dr. Pybass (*see* Tr. 501-504)  He contends that his case should be remanded for payment from that date (doc. 18 at 1-2; *see* doc. 14 at 9-10). The Commissioner, at the undersigned's request, filed a reply on March 21, 2016 (Tr. 22).

---

[2]The plaintiff bases the argument that Dr. Kruse did not have all of his pertinent medical records (*see* Tr. 318) on Dr. Kruse's statements that the plaintiff "says he was hospitalized for psychiatric purposes at Aurora several times, but he cannot give me further information regarding these hospitalizations" and that the plaintiff may benefit from anger management, cognitive behavioral therapy, and/or dialectical behavioral therapy, which  "may already be incorporated into some of his biweekly therapy sessions" (Tr. 588-89).

The parties agree that the ALJ's decision should not be upheld. The question presented is whether this action should be remanded to the Commissioner for further proceedings or reversed for an award of benefits. The decision of whether to remand or reverse rests within the sound discretion of the district court. *Smith v. Astrue*, C.A. No. 3:10–66-HMH-JRM, 2011 WL 846833, at *3 (D.S.C. Mar.7, 2011) (citing *Edwards v. Bowen*, 672 F.Supp. 230, 237 (E.D.N.C.1987)). The Fourth Circuit has held that it is appropriate for a federal court to "reverse without remanding where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir.1974). Remand, rather than reversal, is required when the ALJ fails to explain his reasoning and there is ambivalence in the medical record, precluding a court from "meaningful review." *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir.2013) (citing *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir.2012)). Further, in deciding whether to reverse the Commissioner outright or remand pursuant to sentence four, courts have considered: (1) whether deference cautions in favor of remand; (2) whether plaintiff's own court submissions counsel in favor of remand; and (3) whether the record evidence does not overwhelmingly support a finding of disability. *See e.g., Timmerman v. Comm'r of Social Security*, C.A. No. 2:07-3745-HFF-RSC, 2009 WL 500604, at *5-6 (D.S.C. Feb. 26, 2009).

First, deference cautions in favor of remand, as doing so will allow the ALJ an opportunity "to give proper consideration to all the evidence." *Id.* at *5 (quoting *King v.Califano*, 615 F.2d 1018 (4th Cir. 1980)). Second, the plaintiff's own court submissions counsel in favor of remand. *Id*. As pointed out by the Commissioner, in her initial brief, the defendant twice requests the alternate relief of remand for additional administrative proceedings (doc. 14 at 2, 42), and, with regard to his argument that the ALJ failed to properly consider Dr. Pybass' opinion, the plaintiff stated, "The ALJ did not discuss [the treatment records showing he was compliant and sober] in the decision, and [the plaintiff] submits that his case requires remand for proper consideration of the treatment records

15

subsequent to Dr. Pybass's opinion" (*id.* 32). Finally, the evidence in the record does not overwhelmingly support a finding that the plaintiff was disabled during the relevant period of August 1, 2011[3], to November 8, 2013 (the date of the ALJ's decision). *Timmerman*, 2009 WL 500604, at *6. As the ALJ noted, the plaintiff struggled with substance abuse and compliance with treatment, yet consultative examiners Drs. Kruse and DePace still concluded that he could perform simple unskilled work with limited social interaction (Tr. 26; *see* Tr. 591-93). The ALJ explained that she also was persuaded by the evidence showing the plaintiff experienced increased mental health stability with substance abuse abstinence and medication compliance (Tr. 26). In light of this and other evidence that the ALJ considered, the record does not overwhelmingly support a finding that the plaintiff was disabled.

## **CONCLUSION AND RECOMMENDATION**

Here, as discussed above, there are questions as to whether a finding of disability is warranted. As noted above, the Commissioner states that further administrative action is needed to allow the ALJ to evaluate the plaintiff's residual functional capacity and specifically account for his moderate difficulties in maintaining concentration, persistence, or pace. In addition, the undersigned recommends that the ALJ be specifically instructed to consider and address the allegations of error alleged by the plaintiff. For the foregoing reasons, it is recommended that the district court remand the case pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative action as set forth above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

March 31, 2016
Greenville, South Carolina

---

[3] Notably, the plaintiff does not even argue that he is entitled to remand for payment of benefits from his alleged onset date, August 1, 2011. Rather, the plaintiff argues that the evidence supports a finding that he has been disabled since the date of Dr. Pybass' opinion on April 5, 2012 (doc. 14 at 42; doc. 18 at 2).

16